820 F.Supp. 590 (1993)
HAYNES AMBULANCE SERVICE, INC., a corporation; City Ambulance of Alabama, Inc., a corporation; Med Star Ambulance Service, Inc., a corporation; Suburban Ambulance Service, Inc., a corporation; Suburban Emergency Service, Inc., a corporation; Hank's Ambulance Service, Inc., a corporation; A & A Ambulance Service, Inc., a corporation; Regional Paramedical Service, a corporation; Newman's Medical Service, a corporation; and Community Ambulance Service, Inc., a corporation, individually and for and on behalf of a class of persons or entities providing services to recipients of Medicare and Medicaid benefits as is more particularly referred to in this complaint, Plaintiffs,
v.
STATE OF ALABAMA; Guy Hunt as Governor of the State of Alabama; Alabama Medicaid Agency, an agency of the State of Alabama; Carol Merrman, as the Commissioner of the Alabama Medicaid Agency; and Donna E. Shalala as the Secretary of the Department of Health and Human Services, an agency of the United States of America, Defendants.
Civ. A. No. 92-H-879-N.
United States District Court, M.D. Alabama, N.D.
April 16, 1993.
Jack G. Paden, Bessemer, AL, and Thomas C. Najjar, Jr. and Jesse P. Evans III, firm of Najjar Denaburg, Birmingham, AL, for plaintiffs.
Stuart M. Gerson, Asst. Atty. Gen., Washington, DC, James Eldon Wilson, U.S. Atty., Kenneth E. Vines, Asst. U.S. Atty., Montgomery, AL (David Smith, Office of Gen. Counsel, Dept. of Health and Human Services, Sheila M. Lieber, Pleadings signed by Peter D. Coffman, Attys., Dept. of Justice Civ. Div., Federal Programs, Washington, DC of counsel), for Shalala as Secretary of Dept. of Health and Human Services.
Graddick & Belser, David E. Belser and Charles A. Graddick, Montgomery, AL, for State of AL and Guy Hunt.
William O. Butler, III, AL Medicaid Agency, Montgomery, AL, for AL Medicaid Agency and Herrman, as Com'n.

MEMORANDUM OPINION
HOBBS, District Judge.

I. INTRODUCTION
Plaintiffs, owners and operators of ambulance services,[1] are providers to Medicare *591 and Medicaid recipients in the state of Alabama. Plaintiffs have challenged a regulation of the Alabama Medicaid Agency, which plaintiffs contend illegally restricts the amount of recovery to plaintiffs for services which they provide to poor Medicare patients, such restriction allegedly being in violation of a federal statute. The Court concludes that the challenged regulation does not violate the applicable statute, 42 U.S.C. § 1396a.
Defendant Alabama Medicaid Agency is an agency of the State of Alabama and administers programs and benefits under the Medicare and Medicaid Acts. Defendant Donna E. Shalala is Secretary of the United States Department of Health and Human Services. Shalala is authorized to administer Medicare and Medicaid programs at the request of the Alabama Medicaid Agency. Defendant Carol Herrman is the acting Commissioner of the Alabama Medicaid Agency. Herrman has general supervisory control of the agency including the administration of reimbursement programs under the Medicare and Medicaid Acts. As Governor of Alabama, defendant Guy Hunt is charged with the execution and enforcement of the laws of Alabama.

A. Medicaid
Medicaid is a cooperative federal-state matching program which subsidizes medical care for the needy without regard to the recipient's age. Each participating state designs and administers its own Medicaid program within federal guidelines. If the program is approved by the Secretary of Health and Human Services, the state receives federal funds to help finance the program.

B. Medicare
Under Part A of the Medicare program, which is federally funded, individuals who are 65 years of age and older, and certain disabled persons under age 65, are fully reimbursed the "reasonable cost" for inpatient hospital care without regard to the individual's economic status. 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare program is a voluntary insurance program which allows Medicare-eligible individuals, who are financially able, to obtain supplemental insurance for outpatient medical care. 42 U.S.C. §§ 1395j-1395w-4(j). If an individual qualifies for Part B coverage by obtaining supplemental insurance, the federal government pays for 80 percent of "reasonable costs" charged to the recipient. The recipient is responsible for paying the remaining 20 percent, (the "coinsurance amount") and any annual deductible.

C. Qualified Medicare Beneficiaries
Under federal law, a state "may" agree to pay Part B Medicare insurance premiums for individuals who qualify for Medicare based on age and who have incomes at or below the poverty line. 42 U.S.C. § 1396a(n). Such beneficiaries, who must meet the resource and income limits set forth in 42 U.S.C. § 1396d(p)(1), are designated "qualified Medicare beneficiaries" (QMBs).[2]
The question in this lawsuit is what payment is due the providers of outpatient medical care where the state does not provide supplemental insurance. The Alabama plan, except in rare circumstances, allows such providers only 80% of their reasonable costs; the providers contend that the states must pay 100% of such costs.

II. BACKGROUND
The state of Alabama has obtained approval of a State Medical Assistance Plan from the Secretary of Health and Human Services pursuant to 42 U.S.C. § 1396a. Under the *592 Alabama plan providers for QMBs almost never collect more than 80 percent of their "reasonable costs."
Plaintiffs[3] bring this action under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ccc, and the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, et seq., claiming that as with Medicare beneficiaries who elect to purchase supplemental insurance, providers are entitled to receive 100% of their "reasonable costs" when providing such services to those who have no supplemental insurance such as QMBs.
The parties have agreed that there are no factual disputes on the issue of the proper amount owing providers for the treatment of QMBs pursuant to the Medicare and Medicaid Acts respectively. The parties also agree that the answer is based solely on the applicable statutes. Accordingly, the Court has decided this issue based on cross-motions for summary judgment after considering the briefs of the parties.
As noted, the Court concludes that the Alabama Medicaid Agency is reimbursing health care providers who render Part B services to QMBs at a rate which comports with statutory authority, and that defendants are entitled to prevail on their motions for summary judgment.

III. DISCUSSION
The sole issue presented in this litigation is whether the Alabama State Medical Assistance Plan violates 42 U.S.C. § 1396a when it directs that providers treating QMBs will be paid substantially less than 100% of their "reasonable costs."
The interpretation of a statute by the agency charged with its administration is entitled to "considerable weight." Chevron USA Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984); Rust v. Sullivan, ___ U.S. ___, ___, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991) (Secretary's construction must be accorded substantial deference as the interpretation of the agency charged with administering the statute). Where agency interpretation is in a complex area, it should be upheld if it is reasonable and permissible. Southern Motor Carriers Rate Conference v. United States, 773 F.2d 1561, 1567 (11th Cir.1985) (citing Chevron, 467 U.S. at 843-46, 104 S.Ct. at 2781-84). In the case at bench, deference to the Secretary is particularly applicable since she is charged with administering legislation which "is among the most intricate ever drafted by Congress." Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981) (quoting Friedman v. Berger, 547 F.2d 724, 727 n. 7 (2d Cir.1976) cert. denied 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977)).
In Chevron, the Supreme Court adopted the following two-step test for determining whether an agency's construction of a statute which it administers is entitled to deference:
When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.... If the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82. See also Curse v. Director, Office of Workers' Comp. Prog., 843 F.2d 456, 460 (11th Cir.1988); Hussion v. Madigan, 950 F.2d 1546, 1550-51 (11th Cir.1992).

1. Unambiguous Intent of Congress
The first inquiry under Chevron, as applied here, is whether Congress unambiguously intended that the states be required to *593 pay providers of QMBs 100 percent of their reasonable charges or costs rendered for Part B services. Nothing in the Medicaid or Medicare statutes furnishes any evidence that Congress ever focused on what percentage of "reasonable" Part B provider costs should be borne by the states for QMBs. Although Congress expressly mandated that the states pay in full reasonable costs for Part A inpatient hospital services,[4] nowhere in the statute or accompanying legislation is there language decreeing that the states pick up the full tab for those obtaining Part B outpatient services.
Plaintiffs rely heavily on New York City Health & Hosp. Corp. v. Perales, 954 F.2d 854 (2d Cir.1992) in asserting that providers to QMBs are entitled to collect the state's full cost-sharing reimbursement in accordance with their reasonable costs or charges under the Medicare Act. It is plaintiffs' position that providers of benefits to QMBs should receive the same full payment for their benefits as providers would receive for rendering services to those who have independently paid for Part B Medicare benefits.
The Court finds it difficult to understand, particularly in the face of Congressional silence, why the states must swallow the portion of provider costs to poor Medicare recipients that exceed the 80% mandated by Congress. It is logical acrobatics to determine that Congress "unambiguously" decreed that government would pay 100 percent of such costs to providers for QMBs simply because Congress provided that government pay 80 percent of reasonable provider costs for Medicare beneficiaries with the right given to the provider to collect the remaining 20 percent from the supplemental insurance paid for by the Medicare beneficiary who is able to pay for such insurance.
Plaintiffs' syllogism that because providers to Part B beneficiaries who are able to afford premiums receive 100 percent of their service charges, the same providers to those unable to make these payments are entitled also to collect their fees in full, impresses this Court as clearly not "the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 843, 104 S.Ct. at 2781. Moreover, it is not even remotely suggested in any statutory language. The argument that a provider is entitled to 100 percent of his charge to QMBs originates not from statute, but from ingenious and imaginative lawyering.
Apart from failing to recognize the inherent difference between Part A and Part B Medicare services, plaintiffs have ignored Congress' avoidance of imposing a cost on state welfare systems which are unable or unwilling to do so voluntarily. 42 U.S.C. § 1396a(n); H.R.Rep. No. 247, 101st Cong., 1st Sess., reprinted in 1989 U.S.C.C.A.N. at 1906, 2090; H.R.Rep. No. 105(II), 100th Cong., 2d Sess., reprinted in 1988 U.S.C.C.A.N. at 803, 884. Of course, Congress could mandate that 100% rather than 80% of a provider's bill be paid by the states in situations where patients do not make any part of the 20% supplemental contribution; it has not done so. It seems most illogical, however, that courts would ignore the statutory construction of the Secretary charged with administering the Act, and in the absence of any evidence that Congress addressed the amount of the contribution of the government for such non-contributing beneficiaries, would impose a 100% payment on the states.
As with the plaintiffs here, plaintiff providers in Samuel v. California Dept. of Health Services, 570 F.Supp. 566 (N.D.Cal.1983), sought a declaration that the state's limitation on reimbursement to outpatient providers for services rendered to QMBs violated the federal statute. In rejecting plaintiffs' claim, Samuel held that the plain language of the statute did not place an affirmative duty *594 on the state to pay 100 percent of provider costs for services rendered to QMBs.
The court in Samuel stated that the California plaintiffs erroneously presupposed that the intent of the statute in issue was to assure the health care provider full payment of Medicare costs incurred by a QMB. Citing legislative history, the Samuel court stated that the plaintiffs' presupposition ignored Congress' intent to protect the beneficiary rather than the provider. Samuel, 570 F.Supp. at 570.
In support of its argument that Congress intended QMB Part B health care providers to be reimbursed at the 100% level, which would be available with the individual Medicare beneficiary paying for the supplemental charges, plaintiffs cite the 1965 Senate Report accompanying the initial Medicare Act. S.Rep. No. 404, 89th Cong., 1st Sess. 27 (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 1967-68. An examination of the 1965 legislative history, however, reveals that Congress' concern with a "two-tiered system of health care" applied to Part A inpatient hospital care, not to the Part B voluntary program. See Perales, 954 F.2d at 867 (Cardamone, J., dissenting). As Judge Cardamone correctly observed in his dissent, Congress made a clear distinction between health care services covered under Part A and Part B.[5]
Judge Cardamone's analysis explains the important difference between Medicare patients who pay for supplemental insurance under Part B and QMBs who do not. While both QMBs and pure Medicare beneficiaries are entitled automatically to Part A servicesinpatient hospital servicesthe voluntary and supplementary nature of Part B services precludes automatic entitlement. An outpatient provider is entitled to full payment of the "reasonable value" of the services under Part B only because the beneficiary has paid for supplemental insurance to cover 20% of the cost. This does not suggest, much less compel, the conclusion that if the services are rendered to one unable to pay the 20%, the state must pay it. Judge Cardamone explained:
A pure Medicare beneficiary is entitled to Part B services because he or she pays the enrollment premiums; a dual eligible [QMB] is entitled to such services becauseby virtue of his or her status as a Medicaid recipientthe state pays the enrollment premiums.
Perales, 954 F.2d at 866.
The 1965 Senate Report mandates that under Part A for the same inpatient services, states must pay equally for QMBs and pure Medicare beneficiaries. A comparable direction to the states is lacking regarding Part B charges. Section 9403 of the Budget Reconciliation Act of 1986, P.L. 99-509, 100 Stat. 2053 (1986), which constitutes the 1986 amendments to the Medicaid Act creating QMBs, echoes Congress' earlier recognition that the states could limit amounts owing to providers for outpatient services to QMBs to the Medicaid rate. Section 9403(c)(2) states that "the medical assistance made available to a qualified medicare beneficiary.... shall be limited to medical assistance for Medicare cost sharing.... subject to the provisions of subsection (n) of this section...." 42 U.S.C. § 1396a(a)(10)(F). Subsection (n), in turn, provides:
In the case of medical assistance furnished under this subchapter for medicare cost-sharing respecting the furnishing of a service or item to a qualified medicare beneficiary, the State plan may provide payment in an amount with respect to the service or *595 item that results in the sum of such payment amount and any amount of payment made under subchapter XVIII of this chapter [Medicare] with respect to the service or item exceeding the amount that is otherwise payable under the State plan for the item or service for eligible individuals who are not qualified medicare beneficiaries.
42 U.S.C. § 1396a(n) (emphasis added).
This permissive[6] language demonstrates that Congress did not intend that the states unconditionally be required to reimburse the QMB provider at a rate greater than the Medicaid rate. Indeed, rather than prescribing specific payment methodologies or rates, and consistent with the Medicaid Act's emphasis on flexible state assistance, Congress allowed states the freedom to design their own plans subject to federal approval.
This distinction between Part A and Part B qualification requirements, in tandem with Congress' silence on the states' Part B reimbursement responsibility to QMBs, does not allow this Court to ignore the construction of this complex statute by the Secretary charged with administering it, to order that providers be paid 100% of the reasonable value of their services to QMBs. The interpretation of the statute by the Secretary should not be overruled by the courts because courts may believe that it would be desirable if all providers were compensated at 100% of their costs.

2. Reasonable Construction
Having established that the Secretary's interpretation of the legislation in issue survives the initial Chevron inquiry, the Court's final focus turns to whether the Secretary's interpretation of the statute she is administering is reasonable.
Although the Court believes that the Secretary's interpretation of the statute is the correct interpretation, it need not be the only one which could have been adopted, or even that it be the preferred construction. Pauley v. BethEnergy Mines, Inc., ___ U.S. ___, ___, 111 S.Ct. 2524, 2537, 115 L.Ed.2d 604 (1991). ("[I]t is axiomatic that the Secretary's interpretation need not be the best or most natural one"). The sole determination is whether the Secretary's interpretation is reasonable. Chevron, 467 U.S. at 845, 104 S.Ct. at 2783. Absent "definitive contrary legislative command" reasonable agency interpretation should be upheld. United States v. Fulton, 475 U.S. 657, 666, 106 S.Ct. 1422, 1427-28, 89 L.Ed.2d 661 (1986). Here, the statute, on its face, does not mandate that providers to QMBs be reimbursed 100 percent for Part B services. Likewise, nothing in the legislative history commands the states to bear the entire burden of Part B provider costs.
The Court's finding that the Secretary's interpretation is reasonable is supported by a strong current of state flexibility which, as previously discussed, fashions the Medicaid Act. Because state funds available for public assistance are limited, the states are granted latitude in establishing fees to be paid providers for Medicaid services. See Schweiker v. Hogan, 457 U.S. 569, 590, 102 S.Ct. 2597, 2609-10, 73 L.Ed.2d 227 (1982) ("federal government cannot finance a program that provides meaningful benefits in equal measure to everyone").
The Secretary has approved the Alabama Medicaid Agency's policy of limiting QMB provider reimbursement to the maximum Medicaid amount, rather than the Medicare rate supplemented by insurance paid for by the Medicare beneficiary who is financially able to pay for such insurance.

IV. CONCLUSION
No one questions that Congress can mandate that states pay to medical providers more than their resources can afford, and in order to get the carrot of the federal contribution, states can be required to take on payments to medical providers which devastate state budgeting at the expense of education and other governmental services.
*596 Every year medical costs escalate at substantially greater rates than inflation. Medical costs now equal 14 percent of America's entire economy, an increase in the decade of the 1980s from 9.4 percent. The Commerce Department reports that health care costs climbed 12 percent in 1991, four times the rate of overall inflation. No one suggests that medical providers have suffered over the years from unreasonable caps on their charges.
Courts should not, at the instance of providers, construe Congressional silence to require states to shoulder added medical costs which neither the states, nor the federal agency charged with administering the federal statutes, believe are compelled by Congress.
An appropriate order shall issue.
DONE.

ORDER
Pursuant to an opinion filed contemporaneously herewith, IT IS ORDERED THAT:
1. Plaintiffs' Motion For Summary Judgment is DENIED;
2. Defendants' Motion For Summary Judgment is GRANTED.
NOTES
[1] See 42 CFR § 410.40.
[2] In New York City Health & Hosp. Corp. v. Perales, 954 F.2d 854 (2d Cir.1992) and Samuel v. California Dept. of Health Services, 570 F.Supp. 566 (N.D.Cal.1983), cases both discussed in this opinion, the terms "dual eligibles" and "crossovers" are used respectively to label those individuals eligible for Medicare as well as Medicaid. The term "qualified Medicare beneficiary" was introduced to the Medicaid Act as part of the Act's 1986 amendments and is adopted here for the sake of uniformity. The House Conference Report to the Technical and Miscellaneous Revenue Act of 1988 specifies that all Medicare-eligible persons with resources under the limits called for in 42 U.S.C. § 1396d(p)(1) are to be considered QMBs "whether or not they are otherwise eligible for Medicaid." H.R.Conf.Rep. No. 1104, 100th Cong. 2d Sess., reprinted in 1988 U.S.C.C.A.N. 4515, 5048, 5344.
[3] Although plaintiffs originally sought to bring a class action, defendants agreed that they would be bound by any ultimate judicial decision in this case as to all potential class members. Accordingly, it was agreed in order to simplify the case, which all parties acknowledged was a matter of statutory interpretation, that plaintiffs would withdraw their request to bring this case as a class action.
[4] The 1965 Senate Report covering the initial Medicare Act provides:

No deduction, cost sharing or similar charge may be imposed with respect to inpatient hospital services furnished under the plan. This provision is related to another provision in the bill which requires States to pay reasonable costs for inpatient hospital services provided under the plan.
Taken together, these provisions give assurance that the hospital bill incurred by a needy individual shall be paid in full under the provisions of the State plan ... and that the States may not expect to require the individual to use his income or resources ... toward that bill.
S.Rep. No. 404, 89th Cong., 1st Sess., reprinted in 1965 U.S.Code & Cong.Admin. News 1943, 2019-20 (emphasis added).
[5] Two consecutive paragraphs from the Committee Report offer a clear comparison between the mandatory approach to payment of deductibles for hospital care under Part A and the permissive approach for other services under Part B:

The hospital insurance benefit program included under other provisions of the bill provides for a deductible which must be paid in connection with.... hospitalization benefits.
* * * * * *
A state medical assistance plan may provide for the payment in full of any deductibles or cost-sharing under the insurance program established by Part B of title XVIII. In the event, however, the State plan provides for the individual to assume a portion of such costs, such portion shall be determined on a basis reasonably related to the individual's income, or income and resources ...
S.Rep. No. 404, supra, 1965 U.S.C.C.A.N. at 2020 (emphasis added).
[6] When Congress intended to make it mandatory that state Medicaid agencies pay the coinsurance amount and deductibles for beneficiaries, it did so plainly. See, e.g. 42 U.S.C. § 1396e(a)(3) ("[each State plan] shall provide for payment of all enrollment premiums for such enrollment and all deductibles, coinsurance, and other cost sharing obligations....").